**LILAW INC.**
J. James Li (SBN 202855, lij@lilaw.us)
Andrew Pierz (SBN 292970, pierza@lilaw.us)
Daniel R. Peterson (SBN 326798, petersond@lilaw.us)
1905 Hamilton Avenue, Suite 200
San Jose, California 95125
Telephone: (650) 521-5956
Facsimile: (650) 521-5955

Attorneys for Plaintiff ACADYA CAPITAL GROUP LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACADYA CAPITAL GROUP LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>TEXAS A&M UNIVERSITY, a state entity, and PAO-TAI LIN, a.k.a. Paotai Lin, an individual,<br><br>Defendants. | **Case No.**<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# PARTIES

1. Plaintiff Acadya Capital Group LLC ("Plaintiff" or "Acadya") is a limited liability company organized under the law of the State of California with headquarters located in the County of Santa Clara, California.

2. On information and belief, Defendant Texas A&M University ("TAMU") is a public entity owned by the State of Texas, with the principal place of business located in College Station, Texas.

3. On information and belief, Defendant Pao-Tai Lin ("Lin") is a professor in TAMU's Department of Electrical & Computer Engineering, and a resident of the State of Texas.

4. TAMU, Lin are collectively referred to as "Defendants."

# NATURE OF ACTION

5. This is an Action for fraud and unfair competition.

# JURISDICTION AND VENUE

6. This Court has personal jurisdiction over Defendants because they directed intentional torts against Acadya, a California corporate resident.

7. The venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this case occurred in this district.

8. This Court has subject matter jurisdiction based on the federal diversity jurisdiction under 28 U.S.C. § 1332, with the complete diversity between Plaintiff and Defendants and with the matter in controversy exceeding the sum of $75,000.

# GENERAL ALLEGATIONS

## The Sensor Project

9. Acadya is an investment company that sought to engage an academic institution to develop prototype technical products for commercialization. Acadya was introduced to TAMU's engineering professor, Defendant Lin, through an Acadya advisor who was affiliated with the Texas Engineering Experiment Station ("TEES"), a division of TAMU. Lin and TAMU suggested Acadya to structure the development project as a research grant with Acadya enjoying the exclusive right to


LiLaw Inc.

commercialize the research project, with assistance from Lin and TAMU.

10. Acadya made it clear to TAMU and Lin that this was intended to be a product development project, not a research grant. Defendants assured Acadya they understood the nature of the project, notwithstanding its being named a research grant.

11. Lin and TAMU introduced Acadya to a project for developing a commercial prototype of real-time sensing of CH4 and other gaseous substances (the "Sensor Project"). On behalf of TAMU, Lin represented to Acadya that his lab had extensive experience in real-time gas sensor development and presented to Acadya laboratory data showing the feasibility or proof of concept of the Sensor Project to entice Acadya to invest in the project.

12. Subsequently, on August 22, 2018, Acadya signed a contract with TAMU entitled Research Agreement No. M1803476 (the "Sensor Agreement"). Under the Sensor Agreement, TAMU was to develop a prototype of a mid-infrared sensor for real-time detection of CH4 gas marker.

13. The Sensor Project was to last for a year, divided into four quarters with specific timetables: (1) "Chip design" was to be conducted from the first to third quarter of the project; (2) "Device Fabrication" was to be conducted during the second and third quarter of the project; (3) "Sensor Characterization" was to be conducted from the second to the fourth quarter of the project; and (4) "Protype" was to be conducted during the third and fourth quarter of the project.

14. The Sensor Agreement contained specifications that are typical of a prototype development project, including:

    a. TAMU was to develop a prototype of "mid-infrared sensor for detection of CH4 gas marker" with real-time data processing based on "the semiconductor comparable process."

    b. TAMU was to develop a "sensor module" integrated with a portable system which had "enhanced specificity and sensitivity for CH4 detection" based on "photonics and nondestructive methods."

    c. TAMU was to demonstrate to Acadya the "prototype with individual gas markers" and to deliver to Acadya a "technical report" for transferring know-hows on "how to



LiLaw Inc.

2
COMPLAINT
Case No.

       fabricate the mid-[infrared] sensor" and on how to perform "real-time sensing in terms of materials and fabrication process", and to transfer "sensor modules and integral prototype portable system including the necessary hardware, software, firmware, system descriptions."

    d. TAMU was to promptly disclose to Acadya any intellectual property created in the Sensor Project (the "Project IP") in the form of "Invention Disclosure" that must contain "sufficient detail as to allow [Acadya's] evaluation".

    e. TAMU was to grant Acadya an exclusive world-wide license to all the Project IP upon payment of a license fee, and was provide "reasonable technical assistance" for Acadya's commercialization of the Project IP.

15. The Sensor Agreement provided that Acadya would pay TAMU $250,000 on four equal installments. Originally the project was going to start on August 1, 2018 and to end on July 31, 2019. Thus, the agreement sets forth the time of payment as August 1, 2018 (the originally planned execution date of the agreement), November 1, 2018, February 1, 2019 and May 1, 2019. Both Acadya and TAMU were allowed to terminate the agreement upon a 30-day advanced notice.

16. However, the signing of the Sensor Agreement was delayed until late August 2018. Thus, the parties agreed that the performance of the contract should start on September 1, 2018 and end on August 31, 2019, with the corresponding forward shift by a month in the payment schedule, i.e., the four payments by September 1, 2018, December 1, 2018, March 1, 2019 and June 1, 2019, respectively. According to this revised schedule, Acadya paid the first installment of $62,500 on September 1, 2018. On the same day, Acadya also paid the license fee of $37,000 for the "Project IP."

17. The "Principle Investigator" for the Sensor Project was to be Defendant Lin. All the payments under the Sensor Agreement would go to fund Lin's laboratory works related to the Sensor Project. Throughout the project, Defendant Lin gave roughly biweekly presentations to Acadya via Skype using PowerPoint slides (the "PPT Slides"). In the first quarter of the project, Lin always painted rosy pictures of timely progression of the project in his presentations. Acadya thus timely paid the second installment of $62,500 in early December 2018.



18. After the second installment payment, there were periods of time in which little progress was made in the project. When Lin was asked directly in early 2019 whether he could finish the project by end of July according to the agreed schedule, he said he would probably need two additional months, i.e., finishing the project by October 30, 2019. Thus, the parties agreed to delay the last two payments accordingly by two months, i.e., by May 1, 2019 and August 1, 2019.

19. After the agreed two months delay, Lin repeatedly reassured the timely completion of the project before the third installment was due. Accordingly, Acadya paid the third installment of $62,500 timely in late April 2019.

20. With the last payment day, August 1, 2019, approaching, Acadya asked Lin to do a demo of the prototype sensor that he had repeatedly shown Acadya. Lin said he was not ready to do that, because the project was suffering further delays.

21. Acadya was somewhat surprised because before that point in time, Lin's presentation showed advanced stages of the prototype development, with pictures of the prototype and testing data and graphics. Acadya wanted Lin to give an estimate as to when the project could be finished. Lin asked for two additional months, i.e., delaying the finishing date further to the end of 2019. Accordingly, Acadya delayed its last payment by about two months and made the last payment of $62,500 in October 2019.

22. In November 2019, in one of his regular Skype presentations to Acadya, Lin announced that the project was finished. Acadya then asked for an in-person visit for a prototype demo at TAMU on or about December 15, 2019. Lin responded that he and his students did not have enough time to prepare for the demo and promised to do so in early 2020.

23. In early 2020, Acadya again asked Lin for a prototype demo, Lin did not respond.

24. On or about February 27, 2020, Acadya sent Lin an email again asking for a prototype demo. The next day, Lin responded that he would ask TEES "regarding demo visiting."

25. When Acadya further pressed Lin for a prototype demo, Lin punted the matter to TAMU's businesspeople in TEES, telling Acadya that "TEES will be providing the instruction regarding the demo visiting, and the provisional patent preparation of the project." That was Lin's last communications with Acadya.



LiLaw Inc.

26. On January 30, 2020, Acadya's manager Jason Zhu emailed Shaymala Rajagopalan, a Licensing Manager at TEES, saying that he would like to schedule a visit to TAMU for a prototype demo and to discuss technology transfer and commercialization.

27. Rajagopalan responded by saying that her colleague Macie Avery would respond to Acadya regarding the demo and that Acadya's visit to TAMU regarding technology transfer and commercialization would have to wait until TAMU had "all finer details figured out."

28. About a week after Rajagopalan's response, Marcie Avery emailed Acadya saying essentially Acadya was not welcome to visit TAMU and they preferred "to handle any follow-up related to this project and assistance with Project IP commercialization via phone and email."

29. When Acadya protested, Avery denied TAMU's obligation to provide a prototype demo. Avery further denied TAMU's obligation to supply Acadya with a technical report for transferring know-hows on sensor fabrication and on the real-time sensing, and to transfer sensor modules and the integral prototype portable system including the necessary hardware, software, firmware, system descriptions. Instead, Avery pointed to the PPT Slides that Lin used during the project updates.

30. Acadya only has a few of these PPT Slides. Acadya never treated these slides as the technical report for transferring the know-hows on fabrication of the sensor and on the real-time sensing, and as transferring sensor modules and the integral prototype portable system including the necessary hardware, software, firmware, system descriptions as required by the Sensor Agreement. Such transfer understandably must happen at the end of the project, instead of when Lin was still experimenting with the sensor. The PPT Slides were merely project updates to reassure Acadya of the timely progression of the project. They contained no instructions on transferring the know-hows of the project, let alone the prototype including the necessary hardware, software, firmware, system descriptions.

31. At that point, Acadya tried to get Lin involved to correct Avery's apparent misstatement of the Sensor Agreement. Lin, however, became incommunicado to Acadya. Lin did not even respond to Acadya's request to send all of his PPT Slides from the Sensor Project to Acadya. By then, Acadya felt that Lin probably had defrauded it and had never intended to fulfill the



promises as memorialized in the Sensor Agreement.

32. When Acadya attempted to press the issue further by sending an email to Mark Andrews, another TEES' contract manager whom TAMU has injected into this dispute. Instead of answering questions about the Sensor Project, Andrews brought up another failed TAMU project, which Acadya had suspended about a year prior. Apparently, TAMU was using a dormant project to pressure Acadya to give up its legitimate demands for the Sensor Project.

**COUNT ONE**
**FRAUD**
**(Against TAMU and Lin)**

33. Plaintiff incorporates by reference the foregoing averments as if fully set forth herein.

34. Defendants TAMU and Lin committed fraud against Acadya regarding the Sensor Project, which includes intentional misrepresentations and false promises (collectively the "Sensor Fraud").

35. For the intentional misrepresentation aspect of the Sensor Fraud, Defendants TAMU and Lin made intentional misrepresentation to Acadya regarding the feasibility or proof of concept of the Sensor Project, knowing the falsity of their misrepresentation. TAMU and Lin made intentional misrepresentations about the specific features that they were capable of developing for the Senor Project. TAMU and Lin also made intentional false representation regarding the progress of the Sensor Project, concealing the facts that they never obtained a workable prototype.

36. For the false promise aspect of the Sensor Fraud, TAMU and Lin made false promises to Acadya that it would finish the Sensor Project in one year, that it would demonstrate to Acadya the prototype sensor, that it would deliver to Acadya a technical report for transferring the know-hows on the fabrication of the sensor and on the software system for real-time sensing. TAMU and Lin never intended to keep the above promises. Now, TAMU and Lin are denying to have ever made such promises.

37. Acadya was justified to rely on the Sensor Fraud because they were representations and promises by a reputable university and one of its illustrious faculty members.

38. In reliance of the Sensor Fraud, Acadya paid TAMU $250,000 in four installments,



believing Lin's representations regarding the status of the project. In reliance of the Sensor Fraud, Acadya further paid TAMU $37,000 for licensing the Project IP. In reliance of the Sensor Fraud, Acadya invested many hours of its management personnel and other resources on the Sensor Project.

39. The Sensor Fraud has caused significant damages to Acadya, including its wasted payments to TAMU for the Sensor Project, wasted resources on the Sensor Project, and loss of opportunity that it would have pursued but for the Sensor Fraud.

**COUNT TWO**
**Unfair Competition**
**(against all Defendants)**

40. Plaintiff incorporates by reference the foregoing averments as if fully set forth herein.

41. Defendants' conduct was fraudulent under the laws of the State of California and actionable under the unfair competition law of California, Cal. Bus. and Prof. Code §17200.

42. As a result of Defendants' acts, Acadya has suffered harm and is entitled to recover for its restitutional injuries, the exact amount of which is to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

a. The Court shall award compensatory damages according to the proof.

b. The Court shall award punitive damages for Defendants' fraudulent conducts.

c. The Court shall enjoin Defendants from any further unlawful conduct.

d. The Court shall award attorney's fees and costs of suit herein incurred to Plaintiff.

e. The Court shall award such other and further relief as the Court may deem proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.



7                                                                                                              Case No.
COMPLAINT

1

2   DATED:  November 5, 2020          **LILAW INC.**
                                      Attorney for Plaintiff Acadya Capital Group LLC

3

4
                                      By   /s/J. James Li
5                                          _____
                                           J. James Li, Ph.D.
6

